UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

TIMOTHY SHARP                                                                                    PETITIONER

V.                                                                    CIVIL ACTION NO.1:08CV79-GHD-JAD

LAWRENCE KELLY, et al.                                                               RESPONDENTS

## REPORT AND RECOMMENDATION

      Timothy Sharp was convicted on one count of sexual battery and one count of fondling. His victim was a ten-year-old relative. He was sentenced to thirty years with ten years suspended on the first charge and ten years on the second charge with five years suspended. The sentences were imposed concurrently.

      His conviction and sentence were affirmed on direct appeal. His petition for leave to file a motion for postconviction relief was denied by the Mississippi Supreme Court except as to one of his claims of ineffective assistance of counsel. In that ground Sharp contended his attorney failed to consult with and obtain expert testimony and failed to investigate or otherwise challenge the physical evidence against him at trial. Sharp argued that the victim was injured in a bicycle accident which explained the physical findings of the state's medical expert at trial. The circuit court appointed counsel to represent Sharp and conducted a hearing on this issue. The trial court after hearing the testimony and considering submitted medical records rejected this claim. On appeal the Mississippi Supreme Court affirmed the ruling of the circuit judge and denied postconviction relief.

      Sharp's habeas petition lists twelve grounds for relief. Nine of the grounds accuse his trial counsel of ineffective assistance of counsel. Two accuse his appellate counsel of ineffective assistance of counsel. The one remaining ground accuses the prosecution of the knowing use of perjured testimony and *Brady* violations.

<u>LIMITATIONS ON REVIEW</u>

Because there is no question that Sharp has fully complied with all procedural requirements of Mississippi and federal habeas law, this court must consider each of the claims on the merits. This court's power to upset the judgments of the state courts in a criminal matter is appropriately very limited. The federal courts address only issues affecting substantial federal constitutional rights. The federal courts do not function as super-appellate courts over the states and hold no supervisory authority over those courts. The federal courts may not correct errors of state law unless they also violate the constitutional rights of an accused. *Smith v. Phillips*, 455 U.S. 209, 221 (1981); *Engle v. Isaac,* 456 U.S. 107, 121, n. 21(1982); *Gilmore v. Taylor*, 508 U.S. 333, 348-349 (1993) (O'Connor, J. concurring, "A mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas.").

Even in matters affecting fundamental constitutional rights the federal courts have a very limited scope of review. Title 28 U.S.C. § 2254(d) of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The federal courts may not disturb the legal holdings of the state courts even if convinced they are erroneous. The federal courts may intervene only if it the application of federal law is also objectively unreasonable. *Williams v. Taylor*, 529 U.S. 362 (2000). The AEDPA presumes each

factual finding by the state courts is correct. These findings can be disturbed only if the petitioner rebuts the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

This petitioner's claims have been reviewed in light of the AEDPA's limitations.

## SUMMARY OF THE TRIAL RECORD

Tawnya Keys, a licensed social worker with the Department of Human Services, testified about the Sharp investigation. The investigation was launched as a result of an anonymous phone call. (R. 21.)[1] On July 21, 2000, Keys started the investigation by obtaining an order from the youth court to give her authority to remove the child from the home if she thought that necessary. (R. 21.) She, another social worker and a law enforcement officer went to the defendant's house. (R. 21.) Keys took the child, hereafter referred to as S.A., outside to interview her. The other social worker interviewed the mother in a back bedroom, while the police officer stayed in the living room with Sharp. (R. 22.)

The child was 10 years old at the time. (R. 22.) S.A. on two occasions during the interview asked Keys to make sure that the doors were closed. (R. 23-24.) Twice Keys checked on the doors to reassure her. (R. 23-24.) S.A. told Keys that Sharp had threatened to kill her and her mother if she ever told anyone what he had done. S.A. was scared and did not want to have to stay there. (R. 23-24.) She reported four years of sexual abuse. (R. 24.) She reported being fondled. (R. 24.) Once she responded to the abuse by kicking Sharp in the testicles; running away from him; and locking herself in the bathroom. (R. 24.) She found blood on her panties one time. (R. 24.) S.A. reported the defendant putting his penis into her vagina and an attempt at anal penetration. (R. 24.) Keys removed S.A. from the home that day. (R. 25.) The child could not pinpoint any exact dates

---

[1] All record references are to the trial transcript in state case 2002-KA-310 volume 2, unless otherwise noted.

and times.  (R. 27-28.)  The child's mother initially did not believe the child's report, but after the medical examination had been supportive of her daughter.  (R. 28).

On cross-examination defense counsel brought out that Keys had obtained a court order to remove the child prior to going to the home, (R. 28-29) and had only approximately two years experience at the time.  (R. 29.)  Keys had also interviewed Sharp who denied any wrongdoing.  (R. 29.)  Keys admitted that she had not recorded the interview although recorders were provided for her use.  (R. 30-31.)  Sharp's counsel attempted to create the impression that some of Keys' questioning of the child had been suggestive.  (R. 32-33.)  Keys had suggested using Dr. Chidester to perform the sexual abuse examination.  (R. 33.)  Keys took S.A. to a Dr. Porter for therapy and witnessed the forensic interview through a two-way mirror.  (R. 33-34.)  Keys  admitted that S.A. had denied there was any penetration during the forensic interview with Dr. Porter.  (R. 36.)  During the cross-examination the defense counsel suggested that the mother was given custody of the child only because the mother had testified before the grand jury adverse to the defendant.  (R. 36.)  Keys confirmed that the plan was to keep the child in foster care until after the defendant had been indicted in order to keep the child safe.  (R. 37).

Dr. Linda Chidester testified for the state not only as an expert in the field of medicine but based upon her special knowledge and training in the area of child sex abuse.  She had previously been accepted as an expert in these areas in Mississippi's youth, chancery and circuit courts.  (R. 42-43.)  She conducted an examination of S.A. on July 25, 2000.  (R. 43.)  She noted there were no previous sexual abuse examinations.  (R. 43.)  Chidester testified there is a scale used in the field to examine behaviors that are frequently seen in children who have been sexually abused.  (R. 44.)  The scale is not per se diagnostic for abuse.  (R. 44.)  S.A. was positive on seven of the items on the scale.  (R. 44.)  She had emotional behavioral changes and would tremble.  She had experienced

blackouts and had trouble sleeping. (R. 44.) She cried easily and was afraid of being alone with a particular person. (R. 44.) S.A. knew more about sexual abuse and sexual activities than would be expected for her age. (R. 44.) She had frequent stomachaches and reported frequent pain on urination. (R. 44.) She had a history of urinary tract infections, occasional nighttime bed-wetting, and frequent vaginal itching. (R. 44.) S.A. reported being suicidal at times. (R. 44.) The child had related the history of abuse to Dr. Chidester. (R. 45.) She reported the defendant repeatedly beat her mother and had threatened to kill her and her mother if she told what he had done. (R. 46.)

S.A's hymen which should have been intact at her age was completely absent. (R. 46-47.) Because of the structure of the pelvis and the location of the hymen within that bony structure, a blunt force type straddle injury would not rupture the hymen. (R. 48.) Chidester found a scar beginning within the vagina and extending outside the body toward the rectum. This was indicative of a penetrating trauma. (R. 48-49.) The injuries and history were, in her opinion, consistent with S.A. having been sexually abused. (R. 50.) Chidester testified that it was very common for children to tell different interviewers different things. Sometimes the child was at different place emotionally at different times and sometimes an interviewer might be uncomfortable with the subject matter. (R. 50-51).

On cross examination the defense attorney brought out the fact that the discrepancy between the normal size for the vaginal opening in a 10-year-old and the size of the vaginal opening found in the victim was quite small, suggesting that it was an insignificant difference. (R. 53.) The cross examination stressed that the doctor went into the sex abuse examination looking for sexual abuse. (R. 54.) Defense counsel brought out that S.A. had no sexually transmitted diseases. (R. 54).

S.A. testified against Sharp. Her testimony established all the elements of a sexual battery, (R. 57-58), and all elements of the fondling charge. (R. 59.) She said that she told the social worker

what had happened when she came to the house. S.A. had wanted to leave the house because she was frightened, (R. 59-60), but did not want to leave her mother. (R. 60.) Her testimony was consistent with Keys testimony regarding the history of abuse.

The defense attorney on cross-examination asked S.A. about her interview with Dr. Porter. The child claimed she had told Porter about what her father did to her. (R. 63.) This was in contradiction to Keys' testimony, though it is not entirely clear from the record if the child knew who Porter was. (R. 62.) The child testified that the defendant drank a lot and that he fought with her mother. (R. 64.) The child testified that she had seen the defendant's sons on several occasions, but denied ever telling them that Sharp had done nothing to her. (R. 65).

One of the defendant's sons testified for the defense that S.A. did not sleep in her own room, but routinely slept with her mother and Sharp. (R. 68.) The child did not appear to be afraid of Sharp. (R. 68.) Sharp and the mother argued and the mother had been unfaithful. (R. 69.) Another of Sharp's sons testified that he had never seen Sharp mistreat or mishandle the victim. (R. 73.) He testified that the child normally slept in her own room. (R. 73.) He did not observe anything unusual about the relationship between Sharp and the victim, nor did she appear to be afraid of him. (R. 74-75.) Sharp's wife from an earlier marriage testified that she had been around the victim several times and that S.A. appeared to be a sweet, happy and playful child and that Sharp was a good father to his sons. Sharp was a good father according to this witness. (R. 78-79.)

Sharp testified that he did not molest the victim, though he admitted her mother in the days immediately prior to the investigation had questioned him about S.A.'s report that he had been up against her in the couple's bed. (R. 82.) He said the child was smart and had been well coached to make the accusations. (R. 83.) He thought D.H.S. had coached her. (R. 83.) He had, had limited contact with the mother after his arrest. His estranged wife was told by D.H.S. that if she talked to

Sharp, S.A. would remain in foster care until she turned 18 or until Sharp was in jail. (R. 83.) The mother regained custody of the child after Sharp was indicted. (R. 83-84.) The mother was talking to Sharp about getting a divorce. (R. 84.) Sharp assumed S.A. was being coached by D.H.S. and her mother. (R. 84.) Sharp admitted on cross-examination that he had a drinking problem severe enough to result in problems holding a job. (R. 85).

Sharp was specifically asked by the prosecutor if he had an explanation for S.A.'s injuries. He was asked:

Q. You have no explanation for the tearing of the hymen, the scar tissue on that little girl,--

A. I sure don't. (R. 88).

He admitted to waking up one morning with his leg across the child but denied he was "up against" her. He had not been aware of placing his leg on the child. He denied that any molestation had occurred and denied that there had been a confrontation between him and the mother about it. (R. 89).

## INEFFECTIVE ASSISTANCE OF COUNSEL

To establish ineffective assistance of counsel the petitioner must show, (1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Pitts v. Anderson*, 122 F.3d 275 (5th Cir. 1997). The petitioner must show that counsel's representation "fell below the objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88.

The deficiency determination is not unguided. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, quoting *Michel v.*

*Louisiana,* 350 U.S. 91, 101 (1955). The court is not to analyze counsel's actions in hindsight, but rather to judge his or her decisions in a highly deferential manner. *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994), *citing Strickland*, 466 U.S. at 689.

If counsel's performance is deemed "to have been deficient, then [the court] must determine whether there exists a reasonable probability that but for the complained-of error the outcome of the trial or appeal would have been different." *Sharp v. Johnson*, 107 F.3d 282, 286, n.9 (5th Cir. 1997). A reasonable probability is one sufficient to undermine confidence in the outcome of the proceeding. *Moawad v. Anderson,* 143 F.3d 942, 946 (5th Cir. 1998). In order to make the required showing on the prejudice prong of *Strickland*, a petitioner must not just allege, but must actually prove prejudice. *Bonvillain v. Blackburn*, 78 F. 1248, 1253 (5th Cir. 1986).

## GROUND ONE

Sharp's first ground in the habeas petition is the claim on which the state court granted him an evidentiary hearing. He states the ground as follows:

> Petitioner was deprived of the effective assistance of trial counsel, and deprived of a fundamentally fair trial. At trial the prosecution presented expert opinion testimony stating that there was physical evidence of sexual penetration. Trial counsel failed to investigate physical evidence, did not consult with or call a medical expert to testify, did not consult with the family physician who had examined the alleged victim since the incident supposedly occured (sic). Trial counsel did not in any way challenge the alledged (sic) physical evidence. (Pet. p. 5).

Sharp claims S.A. was injured in a bicycle accident and examined by a doctor for the injury in the months just before his arrest. Testimony from this doctor or another medical expert could have countered the state's evidence regarding Chidester's findings on the physical examination of S.A., according to Sharp. Sharp claims he told his attorney about the bicycle accident and the attorney failed to conduct any investigation or to present this possible defense at trial.

Sharp's trial attorney testified at the state evidentiary hearing on the motion for postconviction relief. He testified Sharp never told him about the alleged bicycle accident. (Supp. R. 8.)[2] He testified that he spoke with Mr. Sharp at the jail on two or three occasions. (Supp. R. 7.) They discussed the medical evidence in the case. (Supp. R. 7.) The defense attorney testified he specifically asked Sharp if he knew of any possible cause for S.A.'s injuries. (Supp. R. 7.) Sharp told his attorney he had caught a small black boy with S.A. but did not know if anything had occurred between them. (Supp. R. 7.) He did not know the boy's first or last name, nor where he lived. (Supp. R. 7.) The attorney did not pursue this vague information. (Supp. R. 7.) The defense attorney discussed witnesses to be called with Sharp. He also met with defense witnesses to prepare them to testify prior to the trial. (Supp. R. 9).

The defense attorney could not remember whether or not he had spoken with the child's mother but, "she was on board with the State, and I did not feel that she would be a good witness for us, and especially since I had both of his sons and his former wife there to testify about what a good father he was." (Supp. R. 10.) He said the trial strategy was to show that Sharp drank too much and couldn't hold a job. Because of this bad behavior, his wife wanted a divorce and her desire for a divorce prompted the allegations. (Supp. R. 10).

Sharp testified to two very brief pretrial meetings with his attorney. He blamed the attorney for failing to present the bicycle accident defense. (Supp. R. 12-13.) Sharp claimed to have had a three or four minute conversation with his defense attorney on January 3, 2001. A second conference was held on January 12, 2001, at the courthouse which Sharp said lasted for only about ten to fifteen minutes. (Supp. R. 13-14.) Sharp denied having seen the discovery. (Supp. R. 14.)

---

[2] The record references in this section are to supplemental volume one, trial court record, No. CV05-104 and Mississippi Supreme Court No. 2006-CP-1407.

Sharp testified that he had told the lawyer about the bicycle accident during a pretrial conference while they they were discussing the physical evidence against him. The lawyer replied that the accident was not important. (Supp. R. 14-15.) Sharp testified he asked about getting an expert witness and that his attorney told him the state would not pay for one. (Supp. R. 15.) Sharp testified he made a list of potential witnesses as directed by his attorney, but that the lawyer failed to come back to the jail to pick up the list. (Supp. R. 16). He neglected to provide either the names of any listed witness or their anticipated testimony.

Sharp claimed he did not have a chance to talk to his attorney about the bicycle wreck on the day of the trial. (Supp. R. 17.) He admitted he did not mention the bicycle accident in his own trial testimony. (Supp. R. 17.) He attributed this failure to the defense attorney having told him this evidence was not important. (Supp. R. 17.) When asked why he did not testify at trial about the accident he said, "I guess I felt it was useless to do so." (Supp. R. 17).

Sharp claimed S.A. came into the house and reported she had wrecked her bicycle. (Supp. R. 19, 21). Her mother checked her, found she was bleeding and they had taken take her to a doctor at a Fulton medical clinic. (Supp. R. 18-19.) Sharp said S.A. reported she had flipped over her bike when it hit a curb. (Supp. R. 19.) The doctor said she had a bruise from striking something hard. There was a little bit of blood, but it was nothing serious. (Supp. R. 20.) The doctor told them it would heal in a few days. (Supp. R. 20.) He claimed the mother could have testified to this injury if subpoenaed. (Supp. R. 20).

On cross-examination at this hearing, Sharp suggested that the accusations against him only came out after months of the girl being kept in foster care and having been given "nerve pills" and being "psyched up." (Supp. R. 26).

On redirect Sharp testified that the discussion of trial strategy was done only during the voir dire on the morning of the trial. (Supp. R. 27.) He had asked his attorney to have another expert look over Chidester's records. (Supp. R. 28).

Medical records were subpoenaed and submitted to the circuit court judge after the hearing. These are presumably the records attached to the traverse, though they are not included in the trial record. (Traverse, Doc. 13, p. 16-21.) No mention is made in these records of either any bicycle accident or any genital injury. The records show the victim was treated for a suspected urinary tract infection and vulvar inflammation in May 2000. The records show treatment for poison ivy on the child's genitals earlier in the same month. In February 2000, the medical records note burning on urination and erythema, which is a redness or rash on her greater labia. Other notes show treatment with antibiotics for bronchitis and a sore throat. Nothing in these records is exculpatory and nothing corroborates Sharp's story of a bicycle accident. Sharp tries to suggest that part of the records have been withheld. Nothing in the state court record nor in the medical records is consistent with any omission in the medical records.

The state's rejection of the claim of ineffective assistance of counsel in failing to subpoena these medical records and to call the physician to trial cannot be held to be unreasonable. It fell to the circuit court judge to determine the credibility of the witnesses at the evidentiary hearing. He clearly credited the defense attorney's testimony that the bicycle accident defense was not pursued because it was not presented to the defense attorney. Additionally Sharp's trial testimony that he had no explanation for the child's injury fully corroborates the defense attorney's claim that he was never told about the alleged accident. Under these circumstances, the attorney cannot be faulted for not pursuing that line of investigation. Finally as noted above, the records do not corroborate Sharp's story. The only proof that the child was injured in a bicycle accident is Sharp's

postconviction testimony and pleadings which are contradicted by his sworn testimony at trial. His testimony is not sufficient to support his claim. *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition ... unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value.") The state court's rejection of this claim is unassailable.

Sharp also claims his attorney was ineffective because he failed to obtain an expert witness for consultation and testimony. The Fifth Circuit has consistently held that "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy, and because allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978). *See also Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981); *Washington v. Watkins*, 655 F.2d 1346, 1363-1364 (5th Cir. 1981). "Where the only evidence of a missing witness' testimony is from the defendant, this Court views claims of ineffective assistance with great caution." *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986).

In Sharp's case this court does not even have the petitioner's version of expected expert testimony. There is no showing that any expert could have assisted in the presentation of the defense, particularly where the physical proof, the medical records and Sharp's own trial testimony do not support the claimed accidental injury. This claim is also raised in Ground Two, *infra,* and discussed in more detail there. He has not shown that his trial counsel was deficient in the handling of the defense, nor has he shown that any alleged deficiency was likely to have impacted the outcome at trial.

Finally the state-court record contradicts Sharp's assertion that his lawyer did nothing to challenge the physical evidence presented in the case. Evidence can be challenged not only by putting on one's own experts but also by cross-examining the prosecution's experts. The cross-examination of the physician suggested the insignificance of some physical findings and attacked the witness for her bias. There is nothing in the record to indicate that the attorney could have done more. This part of the claim lacks merit. Sharp has failed to show either deficient representation or prejudice, much less that the state court's rejection of this ineffective assistance of counsel claim was contrary to Supreme Court rulings, an unreasonable application those rulings or an unreasonable finding of facts.

## GROUND TWO

Sharp faults his trial counsel for not objecting to expert opinion testimony by Dr. Chidester. He contends the admission of testimony based on a study showing common behavioral symptoms in child sex abuse survivors was error that should have been prevented by a timely objection. He claims that "some prejudicial hearsay" was added to this expert's testimony. Sharp argues Chidester was testifying as "a psychologist" and lacked the qualifications to issue psychological opinions.

First, the claim about admission of prejudicial hearsay through Chidester is not supported by specific allegations about what testimony he claims was erroneously admitted. Conclusory allegations are not sufficient to trigger federal court review of a claim. *Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982). Alternatively any testimony by Dr. Chidester regarding the victim's statements was admitted by the trial court in spite of a defense motion *in limine* to prevent their admission. The trial judge held a hearing on the motion and determined the statements were admissible under the tender years exception to Mississippi's hearsay rule. Miss. R.E. 803(25). Because the victim testified and was subjected to cross examination there is no Confrontation Clause

problem. Because his attorney took appropriate steps to keep out this hearsay testimony, there is no deficiency on this issue by Sharp's trial counsel.

Sharp's complaints regarding the doctor's qualifications and testimony are also unfounded. Dr. Chidester is a family practice physician with experience in the field of child abuse. She is a graduate of the University of Tennessee Medical School and a board certified family practitioner. She has been on staff at North Mississippi Medical Center since 1974. Among other organizations, she is a longtime member of The American Professional Society on the Abuse of Children, the International Society for Prevention of Child Abuse and Neglect, the National Adolescent Health Promotion Network and the National Coalition of Physicians against Domestic Violence. She has received specialized education in the fields of child abuse and child sexual abuse. She has received multiple awards over the years in the field because of her work. She was a founder and chairperson of the North Mississippi Child Sexual Abuse Conference from its inception in 1989 through 1993. As of the date of the trial she was a seven-time recipient of the AMA Physicians Recognition Award. She was a founding member of the Itawamba and Lee County Child Abuse Task Forces. She has provided training in the field of children's sexual abuse for the Attorney General's office, judges, lawyers and law enforcement officials.

Sharp complains about Chidester's testimony as well as her qualifications. He specifically challenges her testimony regarding the SASA scale. Chidester testified that the scale listed behaviors common to sex abuse victims. The list of symptoms is not limited to behaviors but includes physical symptoms including stomachaches, pain on urination, frequent urinary tract infections and vaginal itching, symptoms all found in S.A. Chidester testified that the scale was not per se diagnostic for sexual abuse but that the multiple symptoms shown by Sharp's victim, coupled

with the abnormal physical findings and the child's report of abuse were all consistent with her having been sexually abused.

The decision to accept her as an expert and the admission or exclusion of her testimony was within the trial judge's discretion. *Wade v. State*, 583 So.2d 965, 967 (Miss. 1991). Sharp belatedly cites a case in his traverse where the Mississippi Supreme Court held Chidester's expert opinion testimony should not have been admitted. But that case, *Goodson v. State*, 566 So.2d 1142 (Miss. 1990), did not hold that Chidester was not qualified as an expert, only that the record made in that case did not establish her qualifications.

One Mississippi case definitively establishes both that the doctor's qualifications made her an acceptable expert and that her testimony regarding SASA symptoms was in fact admissible under Mississippi law and not subject to valid objection. In *Crawford v. State*, 754 So.2d 1211 (Miss. 2000), the Mississippi Supreme Court recognized that Chidester was properly accepted as an expert not only in general medicine, but also as an individual with expertise in the area of child sexual abuse.[3] In a case where there was a contest about whether the *Frye*[4] or the *Daubert*[5] standard applied, the court held that Chidester was well qualified as an expert and that her testimony regarding SASA symptoms and behaviors passed muster under either standard. Other cases specifically confirm Chidester's standing as a recognized expert in this sad field;[6] the propriety of

---

[3] *Crawford* was overruled on other grounds in *Dilworth v. State*, 909 So.2d 731(Miss. 2005). *Dilworth* addressed and clarified the different state standards for challenging the sufficiency of the evidence to support a verdict and for challenging a verdict as being against the overwhelming weight of the evidence.

[4] *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).

[5] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

[6] *Moore v. State*, 773 So.2d 984 (Miss. Ct. App. 2000) (Chidester was properly accepted by the trial court as an expert in the field of family practice with special knowledge in the field of child sexual abuse. [I]n light of the Mississippi Supreme Court's consistent acceptance of Dr. Chidester as an expert, and its acknowledgment of the

her testimony about symptoms and behaviors common to child sex abuse victims; and how the findings on physical examinations lead to her opinions that certain findings are consistent with sexual abuse.[7]  In fact her standing as an expert is well enough established that in the majority of published cases other attorneys, at least on appeal, have decided not to challenge her qualifications and/or opinions.[8]  Sharp has made no showing how any part of this testimony was subject to a meritorious objection and therefore fails to establish the first *Strickland* prong.  The cases he belatedly cites in his traverse are not binding precedent and/or not on point.  *Gersten v. Sinkowski*, 426 F.3d 488 (2nd Cir. 2005);  *Commonwealth v. Dunkle,* 602 A.2d 830, 836 (1992)(Rejected similar behavioral profiles as not scientifically established at that time.)  Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.  *Clark v. Collins,* 19 F.3d 959, 966 (5th Cir. 1994).

Finally Sharp contends that he received ineffective assistance of counsel because his attorney failed to consult with and call an expert on his behalf.  He relies in his traverse on the case of

---

characterization of her expertise as a 'sub-speciality,' we find no reversible error." *Id*. at 987.)  *Hiengphoe-Thichuk v. State*, 603 So.2d 363 (Miss. 1992), Hawkins, P.J., specially concurring.

[7] *Wilson v. State*, 891 So.2d 237 (Miss.Ct. App. 2004)( Based on tearing of the hymen, scarring and pain after urination, Chidester opined the child had been penetrated and had been fondled or molested.  *Rowlett v. State*, 791 So.2d 310 (Miss. Ct. App. 2001)(Chidester testified that victim's torn hymen was consistent with sexual abuse.)

[8] *Sanderson v.  State,* 872 So.2d 735 (Miss. Ct. App. 2004) (Chidester accepted as an expert in the field of medicine with specialized knowledge and training in the field of child sexual abuse.  She testified to her findings regarding the SASA  scale.  In her opinion the child had been sexually penetrated based on the presence of a torn hymen and enlarged vagina.  Based upon the history given by the child, the penetration was the result of molestation); *Voyles v. State,* 822 So.2d 353 (Miss. Ct. App. 2002) (Chidester testified that the opening the child's hymen being two to three times larger than normal was consistent with sexual abuse.); *Marshall v. State*, 812 So.2d 1068 (Miss Ct. App. 2000) *(*Chidester accepted as an expert in the field of family medicine with special emphasis in the area of child sexual abuse.  She testified the victim showed "trauma associated with the sexual battery and exhibited definite signs of a child who has been sexually abused."  *Id.* at 1071); *Holloway v. State,* 809 So.2d 598 (Miss.  2000) (Trial court had accepted Chidester as an expert.  She testified that an abrasion found on victim was consistent with reported sexual abuse.); *Norman v. State*, 725 So.2d 247 (Miss. Ct. App. 1998) (No appellate challenge to the Chidester's expert testimony); *Wilson*, 891 So.2d 237.

*Gersten*, 426 F.3d 588.  In that pre-AEDPA case, the state presented much more complicated medical proof and called a psychologist to testify about Child Sexual Abuse Accommodation Syndrome.  The federal district court granted habeas relief because the defense attorney neither called nor consulted with medical and psychological experts.  The Second Circuit Court of Appeals affirmed.  But that case, even if it were binding precedent, does not stand for the proposition that every lawyer in every case involving a charge of the sexual abuse of a child is duty bound to call and consult with medical and/or psychological experts.

*Gersten* involved a much older victim with ambiguous physical findings.  The victim had a boyfriend and had mental health issues serious enough to have resulted in her institutionalization before the trial.  The testimony of the psychologist in *Gersten* was not based on SASA but about a totally different syndrome listing different stages of behavior purportedly typical to sexual abuse victims.  The testimony was offered as an explanation for delay in reporting the abuse.  It was  not a study listing common physical and behavioral symptoms of sex abuse survivors, as was in Chidester's testimony.  The psychologist also opined that children simply would not lie about a thing like sexual abuse.  Just as the courts have refused to admit the lie detector tests because their reliability in ascertaining truthfulness cannot be scientifically established, the courts look askance at any individual who claims to have expertise in the area of human honesty and deceit.  Chidester made no such claims in Sharp's case.

The *Gersten* case is also distinguished from this case by the presence of expert affidavits specifically pointing to serious errors in the expert testimony offered against Gersten.  There are no such expert witness affidavits in this case.  Gersten suupplied an expert affidavit that the child sexual abuse accommodation syndrome was discredited and not accepted by experts in the field.  In Sharp's

case there were no colposcopy and microscopic slides. In *Gersten* the adolescent victims hymenal ring was present, though there was a controversy among experts over whether notches or clefts were present in the hymen. The trial expert testified that notches and clefts were the same thing. One expert, in affidavit, opined that the alleged victim had notches in the tissue which would be commonly expected in adolescent girls, and not clefts which would be consistent with a penetrating trauma. In Sharp's case there was a ten year old pre-adolescent girl with an absent hymen, and no serious mental health issues.

To this day no innocent explanation for the physical findings by Chidester has been shown. But most importantly the *Gersten* case is not binding precedent. It was not decided under the increased statutory restraints of the AEDPA and it is not the law as enunciated by the United States Supreme Court. The state court's rejection of this claim cannot be deemed an unreasonable interpretation of Supreme Court jurisprudence based upon any perceived failure to adhere to precedent of other circuit and state courts. Sharp has failed to establish this ground.

<u>GROUND THREE</u>

Sharp's Third Ground complains because his trial lawyer failed to call Dr. Trudy Porter and his wife, Carla Sharp. The victim denied sexual penetration during the first interview with Dr. Porter. He claims other conflicting statements were made. His wife in addition to Dr. Porter would "know about these conflicting statements." (Pet. p. 8).

This ground like others is too conclusory in its allegations to merit consideration. The allegations of other conflicting statements by S.A. is pure conjecture. Sharp does not include supposition about what testimony might have been elicited beyond fact that the victim had denied penetration during Porter's forensic interview. This fact was however established by the testimony

of the social worker. There is no deficiency in the representation, nor resulting prejudice, because

Sharp's counsel did not call Porter to repeat the social worker's testimony.

GROUND FOUR

Sharp contends his trial attorney was deficient in failing to object to purported "prosecutorial

misconduct" in the closing argument. He complains:

> The prosecutors used their entire closing argument to express their personal opinions
> of guilt, personal opinions of the evidence, and vouch for the credibility of the
> alledged (sic) victim. Such statements as, "I suggest that you find him guilty," "We
> ask you to find him guilty," "He is guilty," "She is not lying," "She is telling the
> truth." Trial counsel allowed the prosecutors to improperly influence the jury. (Pet.
> p. 9-10).

The record of the closing argument simply does not support Sharp's claims. In context the

statements of the prosecuting attorneys include neither expressions of their personal opinions nor

any improper vouching for the credibility of the prosecution's witnesses. Just as one example, the

prosecution told the jury to "discuss the evidence. The one that lied to you here today, you're going

to have to decide." The prosecutor did argue that the defendant was guilty, and that he had been

proven guilty; and "I ask that you find him guilty after you go back there and deliberate. Discuss.

Discuss it well." (R. 103). The prosecutor is allowed to argue the case to the jury, to suggest that

the case has been proven and request a guilty verdict. This is routine argument. The prosecutor also

asked the jury to think about the victim who had taken the stand. He talked about how difficult it

would be for S.A. to face Sharp in the court room and tell the jury about the things that he had done

to her. The prosecutor said "This girl did not make this up. She told the truth." This was argument

on the proof presented in a comment on the victim's demeanor from the stand. There was no

expression of personal opinion nor any vouching for the witness. Because there was no misconduct

19

in the manner in which the closing argument was made, Sharp's counsel cannot be faulted for failing to object to it.

GROUND FIVE

Sharp believes his attorney was professionally deficient in cross-examining Dr. Chidester, Tawnya Keys and the victim.

Sharp claims his attorney "entirely failed to cross-examine Dr. Chidester regarding her claim of having found physical evidence of sexual penetration. And failed to question Dr. Chidester about the prior inconsistent statements made by the alledged (sic) victim." (Pet. p. 13.) He does not suggest what questions should have been asked nor state what additional information, concessions or impeachment would have resulted from further cross-examination of the physician, the social worker and the victim. The earlier synopsis of the record shows that this testimony did not, contrary to Sharp's claims here, pass without challenge and adversarial testing.

Sharp claims, "Trial counsel's cross-examination of social worker, Tawnya Keys, left many questions unanswered, or inconclusive, concerning the prior inconsistent statements. Trial counsel simply allowed Ms. Keys to avoid the serious truth about prior conflicting statements the alleged victim ... had told." (Pet. p. 13.) Sharp neglects to advise what prior inconsistent statements his counsel neglected to bring up with Keys. His attorney did obtain a crucial admission from Keys during her cross examination. It was Keys who testified that the victim denied there had been any sexual penetration during her forensic interview with Dr. Porter. Other matters brought out in the cross examination are included in the synopsis of the record above.

Finally Sharp asserts that his attorney asked the child only one question about her prior statements. He faults the attorney for moving on to "something else less meaningful." (Pet. p. 13.)

20

When the child victim apparently contradicted Keys' testimony about having denied sexual penetration to Dr. Porter, the attorney had potentially helpful contradiction. He could reasonably as a matter of trial strategy move on to another subject. Sharp faults his attorney for not cross-examining the child to show that she was "willing to tell lies," "showing that hypnosis had altered her memories," and questioning her about the dates of the attacks. (Pet. p. 13.) First there is no evidence of hypnosis and therefore no basis for a cross-examination about hypnosis. The fact that the child did not recall dates was undisputed in the state-court record, negating any need to cross-examine S.A. about that matter. Finally, the cross-examination of witnesses is clearly a matter of trial strategy. No two lawyers would have conducted the cross-examination the same way. Apparently Sharp desired a very aggressive cross-examination. His attorney clearly understood what Sharp apparently does not-- Badgering a child witness is a fool's tactic.

The record shows that Sharp's counsel tested the prosecution's case. He did not leave the testimony of these witnesses unchallenged. There is no showing of a deficient performance in this area of the case.

<u>GROUND SIX</u>

Sharp alleges his trial attorney failed to object to the hypnotically enhanced testimony of the victim. There is not a scrap of evidence in the trial-court record to support any claim that the child was ever hypnotized, let alone that her testimony was "hypnotically enhanced." Sharp's allegations, particularly on matters where he clearly would not have personal knowledge, are of no probative evidentiary value. *Ross*, 694 F.2d at 1010. This ground fails to meet either prong of the *Strickland* test.

## GROUND SEVEN

Sharp asserts his attorney failed to conduct an appropriate pretrial investigation. His petition claims his lawyer only talked with him "once about case prior to trial, for about 15 minutes, and mainly about how petitioner would plea...." (Pet. p. 14.) While there is no doubt that an adequate pretrial investigation is absolutely crucial to counsel's effective advocacy, *Caraway v. Beto*, 421 F.2d 636, 637-638 (5th Cir. 1970), the record does not support Sharp's conclusory allegations. While the questioning of Sharp's trial counsel was limited at the evidentiary hearing, it is clear that the lawyer met with his client several times. Sharp's own testimony at the state hearing directly contradicts the claim he makes in the present petition both as to the number and content of meetings. His defense attorney went through the discovery materials with his client and specifically sought information and leads from his client about what investigation needed to be conducted. He was unsure whether he had spoken with the defendant's estranged wife but believed that she would have been pro-prosecution, a fact borne out by the testimony of Keys. He also spoke with and prepared defense witnesses for their trial testimony. The attorney was not questioned about what other steps he took in investigating the claim. Sharp does not prove any fruitful avenue of investigation was neglected or that his defense has been prejudiced. He has failed to establish either *Strickland* prong.

## GROUND EIGHT

Sharp complains that his attorney failed to make an effective closing argument. Sharp provides the following as his supporting facts:

> Although the prosecutors repeatedly asked the jury to find petitioner guilty, trial counsel started his closing argument by stating "I'm not going to ask you to find the defendant not guilty." At no time during closing argument did trial counsel even hint that petitioner might be innocent. Trial counsel did not talk about the prior inconsistant (sic) statements, did not mention that nobody even knows when the alledged (sic)act supposedly happened, did not talk about the physical evidence other than saying he don't know about such things. (Pet. p. 14).

Sharp's characterization of the closing argument is inaccurate. His attorney's closing is a cogent argument aimed at raising reasonable doubts about the petitioner's guilt. The petitioner is quite right that the prosecution repeatedly told the jury what to do. The prosecution's closing concluded with, "Discuss it well. And come back and tell this man he is guilty beyond a reasonable doubt." (R. 103.) Sharp's defense counsel, who was there at the time and able to observe the jury's reaction to the state's closing, chose to take a more deferential approach toward the jury while pointing out flaws in the prosecution's case.

Sharp's trial counsel opened his closing argument with, "Ladies and gentlemen, I'm not going to tell you, as the state has done, what to find in this case. I'm not going to tell you to find him not guilty. And to answer the question why would [the child] lie, I can't tell you that." (R. 104.) But he then discussed the evidence which suggested a motivation for the accusations and otherwise cast doubt on the prosecution's case. He pointed out that the entire investigation began with an anonymous phone call. He pointed out the social worker began her investigation going to the home with a court order to remove the child and in the company of a police officer. He argued about Keys' failure to record the conversation and the fact that in several instances by her own testimony she had asked suggestive questions.

Defense counsel said that Sharp drank and that the child's mother had been unfaithful to him. The wife was said to want a divorce, but Sharp would not leave her. (R. 104.) He suggested that if somebody wanted a child to say something badly enough that it could be done. (R. 104-05.) He said:

> I don't have personal knowledge of what happened here. I'm just like you. I don't know why she would say it. But I know this: once Mrs. Sharp his wife and ...[S.A] came up here and got him indicted, the child was given back to Mrs. Sharp. [The child] got to come back home. (R. 105.)

He highlighted the testimony that the child might have been kept in foster care for an extended period of time but for her testimony and that S.A. wanted to go home to her mother. (R. 105).

He brought up Chidester's testimony about the discrepancy between what Chidester expected to find in a 10-year-old girl and what she found in S.A.'s examination. He highlighted for the jury that there was only a 5 mm discrepancy and that there were 23 mm to an inch. He asked the jury why a child who had supposedly been repeatedly molested would cry to be allowed into bed with her attacker at night. (R. 105-106.) He pointed out that the anal examination was normal and the child was negative for any sexually transmitted diseases.

He argued that one of the symptoms of child sexual abuse was reported only after S.A. was removed from the home. Nobody in the family was aware of any blackouts. Defense counsel emphasized the helpful testimony of Sharp's former wife who had to having observed a normal relationship between him and the child. (R. 107.) He closed by saying that Sharp could not testify to what S.A. was thinking or why she was doing what she was doing, but that the child wanted to be with her mother and did not want to be in a foster home until she turned eighteen. (R. 107.) Given that his argument necessarily attacked the credibility of a child witness who was likely to be viewed sympathetically by the jury, this more delicate, oblique approach was certainly within the range of professionally reasonable arguments that could have been made for Sharp. Sharp is not entitled to relief based upon this ground.

GROUND NINE

Sharp concludes his attack on his trial counsel by asserting that the cumulative effects of the assorted failures of trial counsel denied him effective assistance of counsel and a fair trial. Cumulative errors can constitute an independent basis for granting habeas relief but only where the "errors involved matters of constitutional dimension," not errors of state law and only where the

errors "so infected the entire trial that the resulting conviction violates due process." *Derden v. McNeel*, 978 Fed F.2d 1453, 1454 (5th Cir. 1992) quoting *Cupp v. Naughten*, 414 U.S. 141 (1973). Without a finding of any error, there can be no accumulation of error. There is no merit to this claim.

<u>GROUND TEN</u>

Sharp next focuses on the prosecution accusing them of the knowing presentation of false evidence during the trial and of *Brady* violations for withholding evidence favorable to the defense. He alleges that Dr. Chidester perjured herself and withheld evidence when she stated that the victim had not had any previous pelvic examinations. He claims that the victim had three pelvic examinations prior to the examination by Chidester. He claims once again that the child had a bicycle accident which he says very possibly left the scar Chidester found on her examination of S.A. He claims Dr. Chidester chose not share those facts with the jury. In order to prevail on a claim of the knowing use of perjured testimony it is necessary to show:

> (1) [T]he evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false. *Giglio v. United States*, 405 U.S. 150, 153-154, 92 S.Ct. 763, 765-766, 31 L.Ed. 2d 104 (1972); *Boyles v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996). Evidence is "false" if *inter alia*, it is "specific misleading evidence important to the prosecution's case in chief." *See Donnelly v. Christoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed. 2d 431 (1974). False evidence is "material" only "if there is any reasonable likelihood that [it] could have affected the jury's verdict." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996).

*Nobles v. Johnson,* 127 F.3d 409, 415 (5th Cir. 1997).

Sharp fails to make any of the required showings. First Dr. Chidester did not testify that the child had not undergone any previous physical examinations or pelvic examinations. Dr. Chidester's testimony was that the child had not undergone a prior physical abuse or sexual abuse examination. (R. 43.) Nothing in the record contradicts this testimony. The fact that S.A. had prior physical examinations or pelvic examinations does not contradict Chidester's testimony. Sharp

argues that Chidester failed to disclose to the jury that the child had suffered injuries from a bicycle accident which could explain the scar. There is nothing in the record to indicate that the child ever indeed suffered any such accident other than the petitioner's own allegations which are insufficient to raise the issue. The medical records do not corroborate the petitioner's claim of a bicycle accident. Nothing in the record indicates that Chidester had any knowledge of any accidental injury. There is no allegation or any proof that any member of the prosecution team had any knowledge of the purported bicycle accident, the medical records or any knowledge of any purported falsity or inaccuracy in Dr. Chidester's testimony. Sharp has failed to prove this ground.

<u>GROUND ELEVEN</u>

Sharp attacks his appellate counsel accusing them both of causing extensive delays in the direct appeal in state court. The petitioner's trial counsel initially represented the petitioner on appeal. Trial counsel filed a motion for a new trial in January 2001, which was denied within a matter of days. (R. vol. 1, p. 45-47.)[9] He neglected to file a timely notice of appeal, a failure he attributed to not being advised the petitioner wished to appeal. (R. vol. 1, p. 54-55.) He did however move to file the notice of appeal out of time and the motion was granted. (R. vol. 1, 54-55, 61.) When counsel failed to file his appellate brief, the Mississippi Supreme Court entered an order remanding the matter to the trial court to determine if new counsel should be appointed for the appeal. (R. 2002-KA-310, Briefs and Other Pleadings, Order of November 25, 2002.) The trial court had in fact already allowed Sharp's counsel to withdraw and had appointed new counsel. (R. 2002-KA-310, Briefs and Other Pleadings, Order filed on December 10, 2010.) Because of the substitution of counsel there were extensions of time for filing his brief. While there unquestionably

---

[9] This and other references to volume 1 refers to the trial court filings in the criminal case, 2002-KA-310.

were delays in the handling of the appeal, Sharp has not suffered any prejudice as a result of the delays. The direct appeal itself was allowed by the state court just as if timely noticed. The actions of the state court assured that any deficiency by counsel in pursuing the appeals did not work to Sharp's prejudice. Sharp has therefore failed to prove the second prong of the *Strickland* test.

## GROUND TWELVE

Finally Sharp accuses his appellate attorney of ineffectiveness in failing to raise "several important and meritorious grounds during the appeal." Appellate counsel need not raise every "colorable" claim on appeal but has broad discretion to select issues which counsel deems most likely to be successful. *Jones v. Barnes*, 463 U.S. 745 (1985). Sharp provides no specifics regarding grounds that should have been raised except to say that some of those grounds were raised by his *pro se* brief in the state court. The state court expressly addressed the issues raised not only by Sharp's appellate counsel, but also those issues raised in his *pro se* brief. The state court expressly rejected all issues raised as without merit. *Sharp v. State*, 862 So.2d 576, 577 (Miss. Ct. App. 2004). Because the state appellate court considered and rejected the *pro se* issues it is clear that counsel was not deficient in his selection of issues and that Sharp's appeal was not prejudiced.

## CONCLUSION

The undersigned recommends that the petition be dismissed with prejudice.

The parties are referred to 28 U.S.C. § 636(b)(1) and Local Rule 72(a)(3) for the appropriate procedure in the event any party desires to file objections to these findings and recommendations. Objections are required to be in writing and must be filed within fourteen days of this date. Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of filing will bar an aggrieved party from challenging on appeal

both the proposed factual findings and the proposed legal conclusions accepted by the district court

*Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Petitioner is directed to acknowledge receipt of this report and recommendation by signing the enclosed acknowledgment form and returning it to the court within fourteen days of this date. Plaintiff is warned that failure to comply with the requirements of this paragraph may lead to the dismissal of this lawsuit under F.R.Civ.P. 41(b) for failure to prosecute and for failure to comply with an order of the court

THIS the 28th day of May, 2010.

/s/ JERRY A. DAVIS_____
UNITED STATES MAGISTRATE JUDGE